UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
GREAT WHITE BEAR, LLC

                Plaintiff,

    -against -

MERVYNS, LLC,

                Defendant.
-----------------------------------------------------------x

06 Civ. 13358 (RMB)(FM)

**AMENDED COMPLAINT**

**JURY DEMANDED**

        **Plaintiff GREAT WHITE BEAR, LLC**, by its attorneys Nesenoff & Miltenberg, LLP, as and for its Amended Complaint, respectfully alleges as follows:

## THE PARTIES

        1. Plaintiff Great White Bear, LLC ("Great White Bear") is a limited liability company organized under the laws of New Jersey with its principal place of business at 1412 Broadway - Suite 1604, New York, New York 10018. Great White Bear is a wholesale clothing company that sells various lines of outerwear to department stores with storefronts throughout the United States.

        2. Defendant Mervyns, LLC ("Mervyns") is a limited liability company organized under the laws of California with its main office at 223301 Foothill Road, Hayward, California 94541. Mervyns operates midrange retail department stores in California and nine other states, primarily in the West and in Texas, selling name-brand and private label apparel and housewares.

## JURISDICTION AND VENUE

        3. Jurisdiction is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1), and the amount in controversy, exclusive of interest and costs, exceeds the sum of seventy-five thousand dollars ($75,000.00).

        4. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

        5. Great White Bear, as a wholesale company, sells its various lines of apparel to department stores with storefronts throughout the United States such as Macy's, Marshall's, Fashion Bug, Cato,

-2-

Richs, and Dillards. Great White Bear presents its different lines to its buyers and takes orders for its various merchandise. After it obtains the orders from buyers, Great White Bear contracts with independent vendors or agents to manufacture the goods.

6. Rampage Clothing Company (hereinafter "Rampage") is an apparel label marketing collections of Junior' Sportswear and Jeanswear. In March 2005, Great White Bear negotiated an agreement with Rampage by which Great White Bear would sell Junior Coats under the Rampage main label as a licensee. The license agreement did not include a license for Collections (Knits, Wovens, Jackets, and Pants). Great White Bear also had a license through another company to sell Knits and Activewear under the Rampage label, but that license did not extend to the sale of Rampage Collections.

7. In or about late March or early April 2005, Scott Jeffries, a Senior Buyer of Juniors Sportswear at Mervyns, led a group of buyers from Mervyns to meet with Danny Fodiman and Glenn Sands of Great White Bear at Great White Bear's Manhattan offices. Danny Fodiman and Glenn Sands explained to Scott Jeffries and the others from Mervyns that Great White Bear had a license to sell Junior Coats under the Rampage main label. Scott Jeffries responded that Mervyns would not be interested in buying from Great White Bear just Junior Knits and Activewear to sell under the Rampage label. Scott Jeffries further stated, however, that the Rampage brand would be important to Mervyns to have and that Great White Bear should attempt to get a license to sell Collections under the Rampage label.

8. Given the statements of Mervyns's Scott Jeffries to Great White Bear, a meeting was arranged by Great White Bear between representatives of Rampage and Great White Bear with respect to Great White Bear's request for a license to sell Collections under the Rampage label. At the conclusion of that meeting, however, Rampage refused Great White Bear's request for a license to sell Collections under the rampage main label because such a license would put Great White Bear in a position of competing with Rampage itself.

9. Mervyns's Scott Jeffries, upon being informed of Rampage's denial of a license to Great

-3-

White Bear of a license for Collections, said that Rampage's denial to Great White Bear was unacceptable. Mervyns's Scott Jeffries then went with Danny Fodiman and Glenn Sands of Great White Bear and met with Larry Hansel, the President and a main principal of Rampage, to renew the request of Great White Bear for a license to sell Collections under the Rampage label. Rampage's Larry Hansel at first said no, but then after Great White Bear offered a to give a guarantee to Rampage of a minimum amount of business and offered further to accept a license limited to sell to Mervyns under a special Rampage label, Rampage's Larry Hansel agreed for Rampage with Great White Bear that Great White Bear would receive a license for Collections to be sold to Mevyns under the label "R for Rampage."

10. As a consequence of and in reliance on the agreement between Rampage and Great White Bear for a special license for Collections to sell to Mervyns, Great White Bear's Danny Fodiman and Glenn Sands sat in the Rampage showroom together with Mervyns's Scott Jeffries and examined Rampage samples, and Scott Jeffries picked out desired samples and quantities. Also, Great White Bear was set up as a vendor for Mervyns, requiring forms to be filled out, and arrangements were made for Great White Bear to have access to the Mervyns web site. Mervyns then issued purchase orders to Great White Bear based upon what Scott Jeffries had picked out in Rampage's showroom. As to such purchase orders, Great White Bear needed to have them 90 days in advance in order to fill the orders.

11. Because Great White Bear needed to give a guarantee of a minimum amount of business to Rampage per the license, Great White Bear inquired of Mervyns what volume of business was Mervyns going to be giving Great White Bear per the "R for Rampage" Collections license. Mervyns's Scott Jeffries returned the call to Great White Bear in Manhattan and committed Mervyns to placing orders for $13 million at cost allowing for a 10% deviation down (or $11.7 million) over an eighteen-month period. Great White Bear accepted this commitment, reasonably relied upon it and acted upon it by in turn extending a guarantee to Rampage of $5 million business for 18 months at an 8% royalty, entailing a $400,000 payment by Great White Bear to Rampage. Accordingly,

-4-

Mervyns and Great White Bear entered into an agreement whereby Mervyns would be placing orders for $11.7 million of business per the "R for Rampage" Collections license over an eighteen-month period. Pursuant to that agreement, Mervyns's Scott Jeffries informed Great White Bear the initial breakdown that he wanted in the "R for Rampage" Collections.

12. When the next orders came in to Great White Bear from Mervyns, however, those orders were "light" -- smaller than expected. This caused Great White Bear to question whether Mervyns would be hitting the agreed upon numbers per the agreement between Mervyns and Great White Bear, and Great White Bear's Sandy Fodiman placed a call to Mervyns's Scott Jeffries raising that concern. Mervyns's Scott Jeffries returned that call to Great White Bear in Manhattan and reassured Great White Bear that Mervyns would be making up the initial "light" orders.

13. Soon thereafter, however, Scott Jeffries was moved out of his position as a Mervyns Senior Buyer dealing with, among others, Great White Bear. In his place were other representatives of Mervyns -- Laura Willett and Heather Takaji. They handled the Great White Bear account in a deliberately counterproductive way, lacking entirely in good faith and in breach of the agreement by frustrating performance thereunder, so that Great White Bear was set up to fail. Mervyns's Laura Willett and Heather Takaji, among other things, gave to Great White Bear only 60 to 75 days to fill orders, ordered items that were not selling and failed to provide information needed to process orders. On information and belief, Mervyns was building for itself a record with which to terminate the contract and business relationship with Great White Bear. Complicating matters was that in July 2005, the United States reimposed quotas in imports from China, disrupting clothing shipments from that country; and Mervyns again mishandled the relationship with Great White Bear so that the import quotas were a difficult obstacle for Great White Bear to overcome in connection with filling orders for Mervyns under the agreement for Collections to be sold under "R for Rampage" label.

14. In November 2005, the General Merchandise Manager for Mervyns, Michael Wallen, along with Mervyns buyers Laura Willett and Robin Green, met with Danny Fodiman, Sandy Fodiman and Glenn Sands of Great White Bear in Great White Bear's Manhattan offices. Mervyns's

-5-

Michael Wallen stated they had a problem with the Great White Bear goods not selling, but knowing there was a commitment to Great White Bear, they would try to test Great White Bear with small orders but that Mervyns was not interested in any kind of substantial business. The response of Great White Bear was to disagree strongly and explain why there had been problems, which essentially stemmed from the ways that Mervyns was mishandling the business relationship, such as, among other things, not giving sufficient lead time to fill orders and submitting small orders that could not as a practical matter be filled.

15. In January 2006, Mervyns, without justification or excuse, informed Great White Bear that the contract with Great White Bear was done and that Mervyns would be placing no further orders. At that point in time, Mervyns had placed only $2,300,000 in orders of the $11,700,000 in sales over eighteen months committed to by Mervyns under their agreement with Great White Bear. Also, Mervyns returned goods and assessed excess charge-backs. Mervyns's termination of the agreement and related actions were in wrongful breach of that agreement.

16. As a direct consequence of Mervyns's breach and after discharging any duty to mitigate, Great White Bear suffered a loss of $9,400,000 in lost orders. A 40% gross profit rate (computed after costs of goods but before overhead) is standard in the industry; and at that 40% gross profit rate, Great White Bear suffered $3,760,000 in lost profits caused by Mervyns's breach.

17. As a further consequence of the breach of Mervyns's contractual commitment and after discharging any duty to mitigate, additional reasonably foreseeable losses to Great White Bear included: (i) loss of the guarantee payment of $400,000 to Rampage, which had made in reasonable reliance on the agreement between Mervyns and Great White Bear for the sale of Collections under the "R for Rampage" label; (ii) returns and cancellations that were not justified under the agreement and that totaled $250,000; (iii) excess charge-backs that were not justified under the agreement that cost $225,000; (iv) certain samples and development costs that totaled $95,000; (v) additional employee expense that totaled $120,000; (vi) interest totaling $40,000 representing financing cost on goods on hand at Great White Bear intended for delivery to Mervyns per the agreement breached

-6-

by Mervyns; (vii) lost travel expense that was $12,000; (viii) loss of opportunity cost that was $700,000 in other business that Great White Bear specifically did not do due to its contractual obligations to Mervyns; and (ix) loss on showroom expense that was $400,000. The foregoing consequential damages totaled $2,862,000.

## AS AND FOR THE FIRST CAUSE OF ACTION
### For Breach of Contract

18. Great White Bear repeats and realleges paragraphs 1 through 17 as if fully set forth herein.

19. Mervyns made an enforceable agreement with Great White Bear by Mervyns making the commitment to place $11.7 million in orders with Great White Bear over an eighteen-month period and Great White Bear acting in reliance thereon and providing $2.3 million on filled orders in partial performance of the aforesaid agreement. Mervyns acted in breach of the aforesaid agreement when Mervyns took actions intended to set up Great White Bear to fail, such as, among other things, giving Great White Bear only 60 to 75 days to fill orders, ordering items that were not selling, failing to provide information needed to process orders and ultimately building for itself a record with which to terminate the contract and business relationship with Great White Bear. Mervyns further acted in breach of the agreement by terminating that agreement without justification or excuse when only $2.3 million of orders were placed with Great White Bear, $9.4 million of orders short of the contractual commitment over eighteen months, and committing related actions to the termination such as return of goods and excess charge-backs.

20. Proximately caused by the aforesaid breach by Mervyns were damages resulting to Great White Bear in the loss of profits and in the further reasonably forseeable consequential losses suffered thereby.

## AS AND FOR THE SECOND CAUSE OF ACTION
### For Breach of Contract (Good Faith & Fair Dealing)

21. Great White Bear repeats and realleges paragraphs 1 through 20 as if fully set forth herein.

-7-

22. Mervyns made an enforceable agreement with Great White Bear by Mervyns making the commitment to place $11.7 million in orders with Great White Bear over an eighteen-month period and Great White Bear acting in reliance thereon and providing $2.3 million on filled orders in partial performance of the aforesaid agreement. Mervyns acted in breach of its duty of good faith and fair dealing when taking actions intended to set up Great White Bear to fail. Mervyns, among other things, gave Great White Bear only 60 to 75 days to fill orders, ordered items that were not selling, failed to provide information needed to process orders and ultimately building for itself a record with which to terminate the contract and business relationship with Great White Bear. Mervyns acted in breach of the agreement by terminating that agreement without justification or excuse when only $2.3 million of orders were placed with Great White Bear, $9.4 million of orders short of the contractual commitment over eighteen months, and committing related actions to the terminations such as return of goods and excess charge-backs.

23. Proximately caused by the aforesaid breach by Mervyns were damages resulting to Great White Bear in the loss of profits and in the further reasonably forseeable consequential losses suffered thereby.

## AS AND FOR THE THIRD CAUSE OF ACTION
### For Quasi-Contract

24. Great White Bear repeats and realleges paragraphs 1 through 23 as if fully set forth herein.

25. Mervyns made an agreement with Great White Bear by Mervyns making the commitment to place $11.7 million in orders with Great White Bear over an eighteen-month period, and Great White Bear acting in reliance thereon and providing $2.3 million on filled orders in partial performance of the aforesaid agreement. Mervyns acted in breach of the agreement when Mervyns took actions intended to set up Great White Bear to fail, such as, among other things, giving Great White Bear only 60 to 75 days to fill orders, ordering items that were not selling, failing to provide information needed to process orders and ultimately building for itself a record with which to terminate the contract and business relationship with Great White Bear. Mervyns acted in breach of

-8-

the agreement by terminating that agreement without justification or excuse when only $2.3 million of orders were placed with Great White Bear, $9.4 million of orders short of the contractual commitment over eighteen months, and committing related actions to the termination such as return of goods and excess charge-backs.

26. Proximately caused by the aforesaid breach by Mervyns were damages unjustly resulting to Great White Bear in the loss of profits and in the further reasonably forseeable consequential losses suffered thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff Great White Bear demands judgment as follows:

(i) On the First Cause of Action against defendant Mervyns, for a Judgment in an amount to be determined at trial but no less than $6,622,000.00 (six million six hundred twenty-two thousand dollars);

(ii) On the Second Cause of Action against defendant Mervyns, for a Judgment in an amount to be determined at trial but no less than $6,622,000.00 (six million six hundred twenty-two thousand dollars); and

(iii) On the Third Cause of Action against defendant Mervyns, for a Judgment in an amount to be determined at trial but no less than $6,622,000.00 (six million six hundred twenty-two thousand dollars); and

(iv) Granting such other and further relief as to the Court deems just and proper, together with the fees, costs and disbursements of this action.

**Dated:**   **New York, New York**
            **December 6, 2006**            NESENOFF & MILTENBERG, LLP

By: _____
    Philip A. Byler, Esq. (PB/1234)

**Attorneys for Plaintiff**
363 Seventh Avenue - 5th Floor
New York, New York 10001
212.736.4500

Index No: 06 Civ. 13358 (RMB)(FM)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GREAT WHITE BEAR, LLC.,

                              Plaintiff,

  -against-

MERVYNS, LLC.,

                              Defendant.

-----------------------------------------------------------------X

## AMENDED COMPLAINT

Nesenoff & Miltenberg, LLP
Attorneys for Plaintiff
Office and Post Office Address
363 SEVENTH AVENUE
FIFTH FLOOR
NEW YORK, NEW YORK 10001
(212) 736-4500